315 F.3d 239
 Patrick H. HYATT; Herman O. Caudle; Mary P. Lovingood, on behalf of themselves and all others similarly situated; North Carolina Department of Human Resources, Plaintiffs-Appellees,
v.
Jo Anne B. BARNHART, Commissioner of Social Security, Defendant-Appellant.
 No. 01-2021.
 United States Court of Appeals, Fourth Circuit.
 Argued June 3, 2002.
 Decided August 22, 2002.
 
 COPYRIGHT MATERIAL OMITTED ARGUED: Howard Stanley Scher, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., for Appellant. Douglas Stuart Sea, Cox, Gage & Sasser, Charlotte, North Carolina, for Appellees. ON BRIEF: Robert D. McCallum, Jr., Assistant Attorney General, Robert J. Conrad, Jr., United States Attorney, William Kanter, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., for Appellant. Charles McBrayer Sasser, Cox, Gage & Sasser, Charlotte, North Carolina; John R. Wester, Anthony S. Ketron, Robinson, Bradshaw & Hinson, P.A., Charlotte, North Carolina, for Appellees.
 Before WIDENER and TRAXLER, Circuit Judges, and GOODWIN, United States District Judge for the Southern District of West Virginia, sitting by designation.
 Affirmed in part, vacated in part, and remanded by published opinion. Judge TRAXLER wrote the opinion, in which Judge WIDENER and Judge GOODWIN joined.
 OPINION
 TRAXLER, Circuit Judge.
 
 
 1
 In this latest chapter of the Hyatt class action litigation, the Commissioner of the Social Security Administration (the "SSA") appeals the district court's order granting plaintiffs' Seventh and Eighth motions for attorneys' fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C.A. § 2412(d) (West 1994 & Supp.2002). The district court found that the position taken by the SSA in a dispute arising out of a settlement agreement between the parties was not "substantially justified" within the meaning of § 2412(d) and, therefore, that an award of fees and costs was warranted. The SSA asserts that the district court abused its discretion in finding that the SSA's litigation position was not "substantially justified" and, in the alternative, that the award is excessive. We affirm in part, vacate in part, and remand.
 
 I. BACKGROUND
 A.
 
 2
 This class action lawsuit, rapidly approaching the two-decade mark, was initiated by social security disability claimants seeking to compel the Secretary of Health and Human Services to cease the practice of ignoring a claimant's testimony regarding the degree of pain in the absence of objective clinical findings substantiating the alleged pain. We ultimately determined that the Secretary's position evinced a refusal to acquiesce to Fourth Circuit precedent to the contrary,[1] and remanded the case in order for the claims to be reconsidered free of the Secretary's policy of nonacquiescence. See Hyatt v. Heckler, 807 F.2d 376 (4th Cir.1986) (Hyatt II); Hyatt v. Heckler, 757 F.2d 1455 (4th Cir. 1985) (Hyatt I), vacated and remanded sub nom. Hyatt v. Bowen, 476 U.S. 1167, 106 S.Ct. 2886, 90 L.Ed.2d 974 (1986). After our ruling, however, the Secretary continued the policy of nonacquiescence, prompting this court ultimately to order the Secretary to distribute Fourth Circuit law on the subject of pain as a disabling condition to all administrative law judges and others within this circuit who look to the Secretary for advice on such matters. See Hyatt v. Sullivan, 899 F.2d 329, 336-37 (4th Cir.1990) (Hyatt III).
 
 
 3
 After Hyatt III, the SSA promulgated Social Security Ruling ("SSR") 90-1p, which it argued was consistent with circuit precedent. Upon plaintiffs' challenge to this regulation, the district court ordered the SSA to amend SSR 90-1p, and the SSA again appealed to this court. In the interim, however, we issued our decision in Hunter v. Sullivan, 993 F.2d 31, 36 (4th Cir.1992) (per curiam), construing the language of SSR 90-1p as consistent with our precedent. Hyatt III and Hunter effectively ended the class action dispute between the parties. The SSA ended its policy of nonacquiescence and the SSA's then-pending appeal of the district court's decision was remanded by agreement.
 
 
 4
 In March 1994, the SSA entered into a Stipulation and Order of Settlement with the plaintiffs (the "Settlement Agreement") which, broadly speaking, required the SSA to reevaluate "Hyatt III" disability claims that had been denied by the SSA under the improper pain standard. The district court approved the settlement and ordered entry of the consent decree. It appeared that all that was left to do was to wrap up the attorneys' fees due under the EAJA. Unfortunately, that has not been the case.
 
 B.
 
 5
 To date, plaintiffs have filed eight motions for attorneys' fees and costs under the EAJA. The First, Second, and Third motions for attorneys' fees, seeking fees and costs incurred up to July 25, 1985, and amounting to nearly $200,000, were awarded under the provisions of 28 U.S.C.A. § 2412(d) on the basis that the position of the Secretary in the class action litigation was not "substantially justified." See Hyatt II, 807 F.2d at 381-83. Plaintiffs' Fourth and Fifth motions, seeking fees incurred during the period from May 25, 1985 through June 17, 1988, and amounting to nearly $350,000, were awarded under the provisions of 28 U.S.C.A. § 2412(b) (West 1994), based upon a finding that the Secretary had acted in bad faith by refusing to acquiesce to this circuit's standard of pain in disability petitions during this time period. See Hyatt v. Shalala, 6 F.3d 250, 255-56 (4th Cir.1993) (Hyatt IV).
 
 
 6
 Plaintiffs' Sixth motion for attorneys' fees sought just under $1.2 million in fees and costs for the period of June 19, 1988 to June 19, 1994. The district court ruled that plaintiffs were also entitled to fees during this time frame under the bad faith standard of § 2412(b), but we vacated that decision in part. See Hyatt v. Apfel, 195 F.3d 188 (4th Cir.1999) (Hyatt V). Because the government had promulgated SSR 90-1p, which was consistent with circuit precedent, and ceased its noncompliance with that precedent after our opinion in Hyatt III was issued, we held that plaintiffs were entitled to attorneys' fees based on bad faith only for the period from June 19, 1988 to March 30, 1990, the date we issued our decision in Hyatt III, including fees associated with preparing the Fourth and Fifth motions for attorneys' fees. See Hyatt V, 195 F.3d at 190-91. With the exception of fees incurred in working on the Fourth and Fifth motions after March 30, 1990, we held that plaintiffs were not entitled to attorneys' fees for work performed during the period from March 30, 1990 to June 19, 1994, because the government had not acted in "bad faith" and its position had been "substantially justified" after we issued our Hyatt III decision. See Hyatt V, 195 F.3d at 192. Accordingly, we remanded to the district court for a recalculation of the fees due under the Sixth motion for attorneys' fees. On remand, the district court awarded fees and expenses in accordance with our instructions, resulting in a final award of approximately $517,000.
 
 II. THE CURRENT APPEAL
 
 7
 The current appeal involves the district court's award of $1,157,511.51 in fees and expenses under § 2412(d) of the EAJA for plaintiffs' Seventh and Eighth motions for attorneys' fees. These motions, filed in June 1996 and April 2000, respectively, cover plaintiffs' request for attorneys' fees and costs for the period of June 20, 1994 to March 31, 2000. Unlike the prior fee motions, however, the fees and costs sought in these latter two motions arise largely from litigation that arose after the Settlement Agreement was executed by the parties in the class action lawsuit. Of the total amount of fees and costs awarded by the district court for the Seventh and Eighth motions, $51,915.95 reflected work performed by plaintiffs' counsel in preparing the Sixth Fee motion ("fees for fees"), which the SSA does not contest.[2] The remaining fees and costs sought by plaintiffs, and awarded by the district court under § 2412(d), are the subject of the current challenge; specifically, (1) $945,722.05 in attorneys' fees and expenses incurred from June 20, 1994 to March 31, 2000 for monitoring the SSA's compliance with the Settlement Agreement and successfully litigating a dispute that arose between the parties as to the proper interpretation of two provisions in that Agreement; (2) $81,224.54 in costs associated with this work; and (3) $78,648.97 in "fees for fees" associated with plaintiffs' preparation of the Seventh and Eighth motions.
 
 
 8
 The SSA asserts that these fees were improperly awarded because its position in the underlying Settlement Agreement litigation was "substantially justified" within the meaning of § 2412(d). In the alternative, the SSA asserts that the award is excessive because the district court abused its discretion in finding that a "special factor" within the meaning of § 2412(d) justified calculating attorneys' fees for two of plaintiffs' attorneys at a rate in excess of the statutory cap on fees imposed by the statute, and in including fees and costs for several categories of work which were not properly charged to the SSA under § 2412(d) as a result of the dispute.
 
 
 9
 III. "SUBSTANTIALLY JUSTIFIED"
 
 Under § 2412(d)(1)(A) of the EAJA, the
 
 10
 court shall award to a prevailing party other than the United States fees and other expenses ... incurred by that party in any civil action (other than cases sounding in tort) ... brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.
 
 
 11
 Id. (emphasis added). The award of attorneys' fees to a prevailing party, therefore, "is mandatory unless the government can demonstrate that its position was `substantially justified,'" EEOC v. Clay Printing Co., 13 F.3d 813, 815 (4th Cir.1994), or that special circumstances make an award unjust.
 
 
 12
 "`Substantially justified' means `justified to a degree that could satisfy a reasonable person' or having a `reasonable basis both in law and fact.'" Id. (quoting Pierce v. Underwood, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)). "Whether or not the position of the United States was substantially justified shall be determined on the basis of the record (including the record with respect to the action or failure to act by the agency upon which the civil action is based) which is made in the civil action for which fees and other expenses are sought." 28 U.S.C.A. § 2412(d)(1)(B). And, in determining "whether the government acted reasonably in causing the litigation or in taking a stance during the litigation," we must consider the "totality of the circumstances." Roanoke River Basin Ass'n v. Hudson, 991 F.2d 132, 139 (4th Cir.1993). We review the district court's determination that the SSA's position was not "substantially justified" for an abuse of discretion. See Pierce, 487 U.S. at 562-63, 108 S.Ct. 2541.
 
 
 13
 The SSA admits that plaintiffs were "prevailing parties" in the underlying Settlement Agreement dispute and does not contend that any "special circumstances" make the district court's EAJA award unjust. Rather, the SSA only contends that the district court erred in finding that its position on the merits of the Settlement Agreement dispute was not "substantially justified." Accordingly, in order to determine whether the district court abused its discretion in awarding fees and expenses under § 2412(d), we must first examine the underlying dispute which gave rise to the award.
 
 A. The Settlement Agreement Dispute
 
 14
 As previously noted, after our decision in Hyatt III, the SSA ceased its policy of noncompliance with circuit precedent regarding the consideration of pain in disability cases and adopted SSR 90-1p, which we ultimately construed to be consistent with our precedent. At the time, the district court's order to the contrary was pending appeal. Thus, the case was remanded by consent and the Settlement Agreement resolving the merits litigation was entered in March 1994.
 
 
 15
 The essence of the Settlement Agreement was to require the SSA to readjudicate or reassess the claims of all "Hyatt III" class members under the proper disability pain standard. Hyatt III class members were defined as those social security claimants who had raised a disability claim involving allegations of pain which was finally denied or terminated on or after July 7, 1981 (when the SSA began its application of the improper standard), and on or before November 14, 1991 (the date that the proper standard was adopted and applied by the SSA). In other words, the SSA was required to readjudicate disability claims that involved pain and that had been denied during the time that the SSA was applying the incorrect pain standard.
 
 
 16
 Simple enough, it seems. But in 1996, a dispute arose as to whether the SSA was improperly denying class membership to two categories of individuals that plaintiffs contended should have been covered under the Settlement Agreement. Unable to effectuate a compromise, the plaintiffs filed two motions to enforce the Settlement Agreement, seeking a ruling of the district court adopting their interpretation over that of the SSA.
 
 
 17
 The first dispute, which arose in April 1996 and resulted in the June 1996 motion to enforce the Settlement Agreement, originated from the SSA's interpretation of an exclusion from the definition of Hyatt III class membership set out in Paragraph 1(b)(i) of the Settlement Agreement. Paragraph 1(b)(i) applies to individuals who have filed both a Hyatt III claim (i.e., a claim that resulted in a denial between July 7, 1981 and November 14, 1991) and a post-Hyatt III claim (i.e., a claim filed after November 14, 1991 that was also denied). Specifically, the subparagraph provides that the Settlement Agreement does not apply to:
 
 
 18
 A [Hyatt III] claim which has been reasserted by a subsequent application or request for reopening covering the same period of time as the Hyatt III claim and as to which a final determination on the merits was issued on or after November 14, 1991.
 
 
 19
 J.A. 32-33. The dispute concerned when "a final determination on the merits" had been issued after November 14, 1991 on a Hyatt III claim or, stated otherwise, when a readjudication on the merits had taken place so as to preclude the claim from falling within the class of Hyatt III claims entitled to a reassessment or readjudication under the Settlement Agreement.
 
 
 20
 The SSA took the position that the denial of a post-Hyatt III claim for disability benefits that alleged the same onset date as the Hyatt III claim was an adjudication on the merits of the Hyatt III claim if the post-Hyatt adjudicator (1) considered the entire period of disability back to the onset date; and (2) had medical evidence available that described the claimant's condition as of the alleged onset date. In other words, the SSA argued that Paragraph 1(b)(i) was intended to provide an individual with only one decision on the merits of his Hyatt III claim after November 14, 1991 and that, so long as the post-November 14, 1991 decision addressed the entire period reflected in the prior Hyatt III claim, the requisite adjudication had taken place.
 
 
 21
 The district court disagreed. It interpreted the Settlement Agreement as requiring a formal reopening of the prior claim and held that the SSA's practice was not sufficient to reopen the claim so as to trigger appeal rights. In addition, the district court held that the SSA's practice was insufficient to notify the claimant that these rights were being adjudicated, implicating the due process clause. The district court stated:
 
 
 22
 Subparagraph 1(b)[i] ... does not permit Hyatt III class membership denial for a Hyatt III claim ... unless, in a post-Hyatt decision ..., SSA reopened (pursuant to 20 C.F.R. §§ 404.987 or 416.1487) the Hyatt III claim ..., and made a new decision on the merits of the Hyatt III claim, and clearly communicated to the claimant in its post-Hyatt decision that the Hyatt III claim had been readjudicated.
 
 
 23
 J.A. 556.
 
 
 24
 The second dispute, which arose in July 1996 and resulted in the October 1996 motion to enforce, involved the SSA's interpretation of another exclusion from the definition of Hyatt III class membership set forth in Paragraph 1(b)(iii) of the Settlement Agreement.
 
 
 25
 Because the SSA had continued to use an improper pain standard in reevaluating claims after Hyatt II was issued, individuals who were eligible for Hyatt II review of their previously denied claims were not excluded from receiving Hyatt III review under the Settlement Agreement. Subparagraph 1(b)(iii) of the Settlement Agreement, however, provided that the Settlement Agreement would not apply to:
 
 
 26
 A claim as to which the individual received any Class Membership Notice pursuant to the Order of th[e] Court dated June 25, 1985, or the Order dated December 10, 1987 [a Hyatt II claim], but failed timely to respond to such Class Membership Notice.
 
 
 27
 J.A. at 33.
 
 
 28
 In the motion to enforce, plaintiffs challenged the SSA's decision, announced in a letter dated July 15, 1996, that it would also deny Hyatt III class membership to individuals who had timely responded to a Hyatt II notice initially, but who thereafter had either withdrawn the claim or failed to respond to requests for additional information, which the SSA considered to be the equivalent to a withdrawal. In other words, the SSA interpreted a "fail[ure] timely to respond" to a Hyatt II notice to include such withdrawals or effective withdrawals of a Hyatt II claim.
 
 
 29
 The district court again agreed with the plaintiffs, ruling that the SSA's class membership denials based on a claimant's failure to pursue Hyatt II relief once the claimant had timely responded to the notice was not authorized by the Settlement Agreement, and that it conflicted with the Settlement Agreement's notation that Hyatt III claimants need not have exhausted the administrative remedies available to them prior to November 14, 1991. Thus, the district court ruled that:
 
 
 30
 SSA may not deny Hyatt III class membership on the ground that an individual who timely (or untimely with good cause) responded to a Hyatt II notice subsequently withdrew that request for Hyatt II relief or otherwise failed to pursue administrative remedies available under Hyatt II.
 
 
 31
 J.A. 557.
 
 
 32
 Having considered the plaintiffs' motions to enforce the Settlement Agreement collectively, the district court granted the motions on October 21, 1999, and ordered the SSA to identify and rescreen the Hyatt III claims that it had previously rejected under its erroneous interpretation of the challenged portions of the Settlement Agreement. The SSA did not appeal.
 
 B. The EAJA Award
 
 33
 Under the Settlement Agreement, the SSA was released from any further liability associated with its failure to follow circuit precedent in evaluating claims. The Settlement Agreement, however, made no specific provision for the recovery of attorneys' fees or costs incurred by plaintiffs in effectuating the relief called for by the Settlement Agreement, providing only that plaintiffs may "apply for attorney's fees to the extent, if any, permitted by law." J.A. 76.
 
 
 34
 Shortly after the district court issued its order granting plaintiffs' motions to enforce the Settlement Agreement, plaintiffs filed their Seventh and Eighth motions for attorneys' fees under § 2412(b), seeking an award of fees at historic market rates on the basis of the SSA's alleged "bad faith both before and during the course of this litigation." J.A. 1092. In the alternative, plaintiffs sought an award under § 2412(d), at the statutory rate adjusted upward for increases in the cost of living and for special factors, based upon the fact that they were prevailing parties in the litigation and the SSA's position was not "substantially justified."
 
 
 35
 The district court declined to award fees under § 2412(b) for "bad faith," but did award the requested fees and costs under § 2412(d). Relying upon the reasons expressed in its order of October 21, 1999 rejecting the SSA's interpretation of the two disputed provisions of the Settlement Agreement, the district court found that "the position taken by SSA in denying class membership had no reasonable basis in law or fact," J.A. 1094, and therefore was not "substantially justified" within the meaning of § 2412(d). The district court held that plaintiffs were entitled under § 2412(d) to all fees and expenses incurred from June 20, 1994, when plaintiffs began monitoring and investigating the SSA's noncompliance with the Settlement Agreement, to March 31, 2000. Specifically, the court awarded $945,722.05 in attorneys' fees and expenses for monitoring the Settlement Agreement and successfully litigating the disputes that ultimately arose under the Agreement; $81,224.54 in costs associated with this work; and $78,648.97 in fees and expenses associated with preparing the Seventh and Eighth motions.
 
 
 36
 The SSA asserts that the district court abused its discretion in finding that it was not substantially justified in defending its interpretation of the Settlement Agreement. We disagree. We have reviewed the record before us, and the totality of the circumstances leading up to the district court's award of fees and expenses under § 2412(d), and we agree that the SSA failed to demonstrate that its interpretation of the two disputed provisions in the Settlement Agreement was "substantially justified" within the meaning of that statute. As to Paragraph 1(b)(i), we agree that the construction of it used by the SSA was unduly restrictive and inconsistent with the intent of the law and the ostensible purposes of the Settlement Agreement to effect a full and fair review of the prior rejections. With regard to Paragraph 1(b)(iii), again we agree with the district court that the SSA's interpretation of the exclusion was substantially unjustified and operated to exclude unnecessarily from reconsideration a group of claimants entitled to review.
 
 
 37
 Given the long history of the SSA's fight to deny claimants the benefit of this circuit's pain standard, its effort to ignore the prior decisions of the courts in this case, the fact that its construction of the provisions in question was unnecessarily narrow so as to cause the denial of proper consideration yet again to intended beneficiaries, and the district court's familiarity with the parties and the tortured path of their litigation, we cannot say that the district court's ruling was as an abuse of discretion. Accordingly, because plaintiffs were the prevailing parties in the Settlement Agreement litigation and the SSA's interpretation of the pertinent portions of that Agreement was not substantially justified, plaintiffs are entitled to attorneys' fees and expenses allowed under § 2412(d)(1) of the EAJA.
 
 IV. REASONABLENESS OF THE AWARD
 
 38
 Having determined that the district court did not abuse its discretion is awarding fees and costs to the plaintiffs, we now turn to the SSA's challenges to the amount of fees awarded.
 
 
 39
 Under § 2412(d)(2)(A), "fees and other expenses" that may be awarded to a prevailing party in a civil action against the government must be "reasonable." 28 U.S.C.A. § 2412(d)(2)(A)(ii) (internal quotation marks omitted). The statute also provides a maximum hourly rate that can be awarded. Specifically, Congress provided that:
 
 
 40
 [t]he amount of fees awarded ... shall be based upon prevailing market rates for the kind and quality of the services furnished, except that ... attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.
 
 Id. (emphasis added).[3]
 
 41
 The SSA asserts that the district court's award runs afoul of these limitations upon a recoverable fee under the EAJA in two respects. First, the SSA asserts that the district court abused its discretion in finding that "a special factor" justified an hourly rate for two of plaintiffs' attorneys in excess of the statutory cap. Second, the SSA asserts that the attorneys' fees and costs awarded were not "reasonable" because they included categories of work performed by plaintiffs' counsel or their employees that the SSA contends is not fairly charged to it under the EAJA and the dispute which gave rise to the award.
 
 A. The Special Factor Enhancement
 
 42
 We begin with the SSA's challenge to the district court's conclusion that the "special factor" exception to § 2412(d)(2)(A) justified an increase in the hourly rate for two of plaintiffs' attorneys above the statutory cap based on the attorneys' expertise in this social security class action litigation.
 
 1.
 
 43
 Under § 2412(d)(2)(A)(ii), an award of attorneys' fees may not exceed the lower of the prevailing market rate or the statutory cap, except in very limited circumstances. See Pierce, 487 U.S. at 571-72, 108 S.Ct. 2541. Specifically, the district court may only exceed the threshold hourly rate if "an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C.A. § 2412(d)(2)(A)(ii). The mere fact that there is a short supply of lawyers skilled and experienced enough to handle the case is not a "special factor." See Pierce, 487 U.S. at 571-72, 108 S.Ct. 2541. Rather, "the `special factor' formulation suggests Congress thought that [$125] an hour was generally quite enough public reimbursement for lawyers' fees, whatever the local or national market might be." Id. at 572, 108 S.Ct. 2541.
 
 
 44
 In order to establish that the "limited availability of qualified attorneys for the proceedings involved" is a "special factor" justifying a fee in excess of the hourly cap, the prevailing party must show that their "attorneys ha[d] some distinctive knowledge or specialized skill needful for the litigation in question — as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation." Id.
 
 
 45
 Specific examples of this requisite "distinctive knowledge or specialized skill" cited by the Court include "an identifiable practice specialty such as patent law, or knowledge of foreign law or language." Id. But, examples of purported "special factors" specifically rejected by the Court are also instructive. They include "[t]he novelty and difficulty of issues, the undesirability of the case, the work and ability of counsel, and the results obtained," all of which the Court considered to be "little more than routine reasons why market rates are what they are." Id. at 573, 108 S.Ct. 2541 (internal quotation marks omitted). The "customary fees and awards in other cases" was also rejected as a special factor. Id. (internal quotation marks omitted). See generally Pollgreen v. Morris, 911 F.2d 527, 537 (11th Cir.1990) (elaborating on the meaning of "special factor" under § 2412(d)(2)(A)(ii)); Jean v. Nelson, 863 F.2d 759, 774-75 (11th Cir.1988) (same).
 
 
 46
 Cases applying the "special factor" formulation defined in Pierce have also noted its narrow application, although views as to exactly how narrow it should be have varied somewhat. The D.C. Circuit, for example, has observed that the two identifiable practice specialties cited by Pierce as justifying awards in excess of the statutory cap — "patent law, or knowledge of foreign law or language" — were "both specialties requiring technical or other education outside the field of American law." See Waterman S.S. Corp. v. Maritime Subsidy Bd., 901 F.2d 1119, 1124 (D.C.Cir.1990) (internal quotation marks omitted). And, the D.C. Circuit later rejected the notion that lawyers practicing administrative law in technical fields or regulated industries would qualify for an enhanced hourly rate solely by virtue of such specialized expertise:
 
 
 47
 To be sure, lawyers practicing administrative law typically develop expertise in a particular regulated industry, whether energy, communications, railroads, or firearms. But they usually gain this expertise from experience, not from the specialized training justifying fee enhancement. If expertise acquired through practice justified higher reimbursement rates, then all lawyers practicing administrative law in technical fields would be entitled to fee enhancements.... [N]othing in the Equal Access Act or its legislative history indicates that Congress intended this result....
 
 
 48
 F.J. Vollmer Co. v. Magaw, 102 F.3d 591, 598-99 (D.C.Cir.1996) (internal citation omitted) (rejecting fee enhancement for specialized expertise in firearms law); see also Estate of Cervin v. Commissioner of Internal Revenue, 200 F.3d 351, 353-55 (5th Cir.2000) (rejecting fee enhancement for special expertise in tax law and Texas community property law and insurance law).
 
 
 49
 The Eleventh Circuit, on the other hand, appears to take a slightly more lenient view, suggesting that a "special factor" rate enhancement might be appropriate for attorneys who have a special expertise in a narrow legal specialty, such as patent or immigration law, or who are fluent in foreign languages relevant to the litigation. See Jean, 863 F.2d at 774. However, that court also noted that "not every immigration attorney or immigration lawsuit warrants an upward adjustment of hourly rates and we would suggest that such is also the case in some patent or foreign law cases." Id. at 774-75 n. 12. Rather, "application of the phrase will necessarily depend on the complexity of the case (`the litigation in question') and on the experience (`distinctive knowledge') and acquired expertise (`specialized skill') of the particular billing attorney." Id. at 775 n. 12. The Seventh Circuit has similarly declined to limit the specialized expertise justifying an enhanced rate to technical specialties outside the field of American law, holding that
 
 
 50
 [w]e think that the directive of the Supreme Court in Pierce makes clear that the special skill requirement of the statute can be defined in terms of either an identifiable practice specialty not easily acquired by a reasonably competent attorney or special non-legal skills such as knowledge of a foreign language.... Pierce directs the courts to recognize that certain practice areas require more advanced and specialized legal skills than those possessed or easily acquired by most members of the bar. In our view, Pierce acknowledges that there will be cases in which such specialized training will be necessary. Nevertheless, we believe that such cases will be the exceptional situation and that, by providing for the "specialized case," Congress did indeed contemplate such a situation.
 
 
 51
 Raines v. Shalala, 44 F.3d 1355, 1361 (7th Cir.1995) (emphasis added). In sum, the court held, "the appropriate inquiry is whether the individual case presents such an unusual situation that it requires someone of specialized training and expertise unattainable by a competent attorney through a diligent study of the governing legal principles." Id. (internal quotation marks omitted).
 
 2.
 
 52
 In this case, plaintiffs sought an increase in the § 2412(d) statutory rate to historical market rates ranging from $190 to $275 per hour for Attorney Sasser and from $190 to $250 per hour for Attorney Sea, both of whom work with the law firm of Cox, Gage & Sasser in Charlotte, North Carolina. The district court awarded the upward adjustment of the hourly rates of Sasser and Sea, finding that they "possess[ed] specialized skills and distinctive knowledge with regard to the Social Security Act and Social Security practices, procedures, regulations, guidelines, and case law, as well as class action enforcement and procedure" and the "necessary expertise in complicated, Social Security class actions as well as the technical knowledge to monitor SSA compliance with court orders, discover SSA's violations and implement effective relief for a large plaintiff class." J.A. 1097.[4] The court then proceeded to find that such specialized expertise was necessary for the litigation in question and that no other competent counsel in North Carolina was available at the statutory rate. Thus, the court found that the plaintiffs had met the three requirements of Pierce for a "special factor" enhancement.[5]
 
 
 53
 The SSA does not dispute that Sasser and Sea possess special expertise in the practice of social security law, as well as in the handling of class action lawsuits. Nor do we find it to be much of a question. This lawsuit, spanning nearly two decades, has alone bestowed that expertise upon them, even if they did not previously possess it. Rather, the SSA argues that counsel did not possess "distinctive knowledge or specialized skill needful for the litigation in question — as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation." Pierce, 487 U.S. at 572, 108 S.Ct. 2541.
 
 
 54
 We agree. And, we need not determine whether Pierce contemplates either an identifiable practice specialty not easily acquired by a reasonably competent attorney or a specialty requiring technical or other education outside the field of American law. Under either interpretation of Pierce's intended effect, the expertise of plaintiffs' attorneys brought to bear in this case is insufficient.
 
 
 55
 We note that plaintiffs do not contend that expertise in class action enforcement and procedure is a "special factor" warranting an increase in the statutory maximum rate. Nor would it be, as the expertise to handle class actions should certainly not be beyond that possessed or easily acquired by reasonably competent attorneys licensed to practice law. And, we note, the weight of authority suggests that most courts consider special expertise in social security law as insufficient to warrant an enhancement, at least in the routine social security benefits case. See Raines, 44 F.3d at 1361 (holding "that the area of social security law cannot in itself be considered such a specialized area of law practice as to warrant, as a general rule, payment in excess of the [statutory] rate"); Stockton v. Shalala, 36 F.3d 49, 50 (8th Cir.1994) (reversing enhancement for attorney's expertise in a "straight-forward social security disability case that did not involve particularly difficult or complex issues"); Harris v. Railroad Ret. Bd., 990 F.2d 519, 521 (10th Cir.1993) (holding "that a Social Security specialist does not solely by virtue of that expertise fall under the `special factor' exception"); Chynoweth v. Sullivan, 920 F.2d 648, 650 (10th Cir.1990) ("We cannot say that the law of Social Security benefits falls sufficiently outside the mainstream of general legal practice to be automatically entitled to enhancement under" § 2412(d)(2)(A)(ii).). But see Begley v. Secretary of Health & Human Servs., 966 F.2d 196, 200 (6th Cir.1992) (vacating and remanding an award to counsel in a social security class action case for consideration of "special factors" because "[t]he district court failed to exercise its discretion to decide the[] issues"); Pirus v. Bowen, 869 F.2d 536, 542 (9th Cir.1989) (holding that practice specialty in social security disability law, and experience with class action challenges under that law, can be a specialty that falls within the parameters of Pierce).
 
 
 56
 We agree that expertise in social security law would be of the type that is possessed or easily acquired by reasonably competent attorneys licensed to practice law. And, we are persuaded that combining expertise in these two practice specialities — class action litigation and social security disability law — does not then become an expertise beyond that which can be acquired by the diligent study of these not uncommon areas of American law.
 
 
 57
 This leaves us with the claim that the "special factor" enhancement was properly applied because Sasser and Sea possessed expertise in class action law, social security law, and "the technical knowledge to monitor SSA compliance with court orders, discover SSA's violations and implement effective relief for a large plaintiff class." J.A. 1097. We disagree.
 
 
 58
 First, we fail to see how the "technical knowledge" of social security law and its practice is different from simply a specialized expertise in that area of the law and a proficiency in its practice. To the extent plaintiffs' counsel rely upon their ability to maneuver through the more informal or even unwritten protocols established within the agency, we are also unpersuaded. Practice specialties in the administrative arena will all involve this ability, which of course will be unique to the specialty but still acquired from the practice of it. If plaintiffs' counsel have undertaken any exceptional or specialized education or training beyond the diligent study and practice required of any practice speciality, the district court has offered no elaboration as to what that specialized education or training has been. And, to the extent plaintiffs' counsel rely upon some expertise in computer skills, we think it safe to take note of the routine necessity of such skills in today's law practices.
 
 
 59
 Second, even if we were to assume that plaintiffs' counsel can establish a "distinctive knowledge or specialized skill" by cobbling together the expertise they have gained in handling this long and arduous class action lawsuit, there has been no satisfactory showing that such expertise was necessary to handle the dispute that actually gave rise to the award of attorneys' fees and costs currently at issue. At this juncture of the litigation, the class action social security litigation has been settled. The dispute that gave rise to the plaintiffs' ability to recoup attorneys' fees and costs under the EAJA is a dispute regarding the interpretation of two relatively uncomplicated provisions in the Settlement Agreement. Indeed, the perceived clarity of those provisions is in large part responsible for the district court's determination that the SSA's interpretation of them was not "substantially justified" in the first instance. We have no doubt that Sasser and Sea were logical choices to litigate the Settlement Agreement dispute, given the practical knowledge they had gained in assisting with the underlying merits litigation and drafting that Agreement. However, we fail to see how the expertise gained by Sasser and Sea in the underlying social security class action can be considered a "special factor" justifying the district court's decision to take this rather narrow Settlement Agreement dispute outside the norm and into the exceptional case required by Pierce.
 
 
 60
 To conclude, even if we were to assume that this case was historically one involving such difficult or complex social security issues so as to render it a "special factor" case warranting an hourly fee in excess of the statutory maximum, the current status of this case is one for fees arising exclusively from the interpretation of two provisions in the Settlement Agreement. Plaintiffs have not made a sufficient demonstration that counsel's "technical expertise in monitoring compliance with a court order," rises to the requisite level of a specialized skill contemplated by Pierce. Nor do we believe the ability to monitor compliance with a court order and to discover violations and implement effective relief for a large plaintiff class equates to the examples given by the Court in Pierce — education and expertise in patent law and specialized, non-legal education in foreign law or language. We have no doubt that Sasser and Sea are extraordinarily qualified to handle complicated class action social security lawsuits and that they are, as a result of this expertise, able to command an hourly market rate along the lines of that requested by them. But plaintiffs have failed to demonstrate that Sasser and Sea possessed specialized training or expertise beyond that which can and should be acquired by a reasonably competent attorney engaged in the practice of a legal specialty that he or she has chosen to become proficient in by diligent study and work. They are, therefore, limited to the statutory cap of § 2412(d)(2)(A)(ii).
 
 B. Challenges to the Amount of Hours
 
 61
 We now turn to the SSA's challenges to the amount of the fees and costs awarded for several specific categories of work performed by plaintiffs' counsel, which the SSA contends were not compensable under § 2412(d). The SSA disputes the district court's award of fees associated with transferring various case-management responsibilities from Legal Services Corporation to a non-profit community legal office, for training provided to individual lawyers for handling individual Hyatt III claims, and for various non-legal tasks that were performed by a paralegal employed by plaintiffs' counsel.
 
 
 62
 Once the district court determines that plaintiffs have met the thresh-old conditions for an award of fees and costs under the EAJA, the district court must undertake the "task of determining what fee is reasonable." INS v. Jean, 496 U.S. 154, 161, 110 S.Ct. 2316, 110 L.Ed.2d 134 (1990); see also Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). "A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee." Hensley, 461 U.S. at 437, 103 S.Ct. 1933. However, "[w]here settlement is not possible, the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended." Hensley, 461 U.S. at 437, 103 S.Ct. 1933. Counsel "should submit evidence supporting the hours worked," id. at 433, 103 S.Ct. 1933, and exercise "`billing judgment'" with respect to hours worked, id. at 434, 103 S.Ct. 1933. "Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." Id. at 434, 103 S.Ct. 1933; see also Kelly v. Bowen, 862 F.2d 1333, 1335 (8th Cir.1988) (holding "that the district court has the authority under § 2412(d)(2)(A) to award those reasonable and necessary expenses of an attorney incurred or paid in preparation for trial of the specific case before the court, which expenses are those customarily charged to the client where the case is tried" (internal quotation marks omitted)).
 
 
 63
 The district court is accorded "substantial discretion in fixing the amount of an EAJA award," Jean, 496 U.S. at 163, 110 S.Ct. 2316, but is charged with the duty to ensure that the final award is reasonable. The extent of a plaintiff's success is an important factor to consider when determining the reasonableness of the fees requested. See Hensley, 461 U.S. at 440, 103 S.Ct. 1933. Unsuccessful claims that are "distinct in all respects" from the claims upon which the plaintiff has prevailed "should be excluded in considering the amount of a reasonable fee." Hensley, 461 U.S. at 440, 103 S.Ct. 1933; see Jean, 496 U.S. at 163 n. 10, 110 S.Ct. 2316. In sum, the EAJA provides that attorneys for a prevailing party should be paid "for all time reasonably expended on a matter," but the EAJA should not "produce windfalls to attorneys." Hensley, 461 U.S. at 430 n. 4, 103 S.Ct. 1933 (internal quotation marks omitted); see also Daly v. Hill, 790 F.2d 1071, 1084 n. 18 (4th Cir.1986) (noting that an attorney's fee "must adequately compensate counsel without resulting in a windfall").
 
 1.
 
 64
 We begin with the SSA's contention that the district court abused its discretion in awarding fees and costs associated with work performed in transferring responsibilities from Legal Services to the North Carolina Justice and Community Development Center ("NCJCDC").
 
 
 65
 After the parties entered into the Settlement Agreement, a change in the law prohibited recipients of funds from Legal Services Corporation from initiating or participating in class action lawsuits against the federal government. See 45 C.F.R. § 1617.1-1617.4 (2001). As a result, plaintiffs were forced to terminate the involvement of Legal Services in the monitoring and implementation of the Settlement Agreement. Legal Services' role was largely transferred to the NCJCDC, a non-profit community organization in North Carolina.
 
 
 66
 We agree that the district court abused its discretion in awarding fees and costs associated with this transfer under the EAJA. As previously noted, no provision for the recovery of attorneys' fees and costs incurred in effectuating the relief called for by the Settlement Agreement was made by the parties; rather, the Settlement Agreement provides only that plaintiffs may "apply for attorney's fees to the extent, if any, permitted by law." J.A. 76. The district court, we have concluded, properly found that an award of fees and costs was justified under § 2412(d) because the SSA's position in the Settlement Agreement litigation was not "substantially justified" and, therefore, such an award was permitted by the agreement between the parties. Fees and costs associated with transferring legal responsibilities from Legal Services to NCJCDC, however, were not the result of any action taken by the SSA and, in particular, were not the result of actions or positions taken by the SSA which were not "substantially justified." It was the result of a law passed after the Settlement Agreement was reached.
 
 
 67
 We do not condone the SSA's decision to continue their litigious posture in the wake of a what should have been the end of this matter. For this reason, plaintiffs are entitled to recover fees and costs incurred as a result of that dispute. But, fairness and reasonableness dictate that the SSA may only be held liable for attorneys' fees and expenses fairly attributable to the unjustified positions taken by the SSA. The SSA does not, by virtue of disagreement with plaintiffs' counsel over provisions in the Settlement Agreement, thereby become liable for any and all categories of work performed by plaintiffs' counsel in the interim.
 
 
 68
 Accordingly, we conclude that the district court erred in awarding fees and costs associated with transferring legal responsibilities from Legal Services to NCJCDC. On remand, the district court should recalculate the amount of fees and expenses awarded so as to exclude these amounts from the total award.
 
 2.
 
 69
 We likewise conclude that the district court abused its discretion in awarding fees and costs associated with counsel's work recruiting and training attorneys in the North Carolina Bar to handle individual Hyatt III claims, setting up and maintaining a database of attorneys willing to accept Hyatt III referrals, and sending announcements to this database of attorneys.
 
 
 70
 Again, plaintiffs are entitled to recover attorneys' fees under § 2412(d) for litigation under the Settlement Agreement if the SSA's position in the litigation is not "substantially justified." But, fees and costs associated with recruiting and training attorneys to handle individual Hyatt III claims were not incurred as a result of any actions or positions taken by the SSA under the Settlement Agreement that were not "substantially justified" and, therefore, are not reimbursable under § 2412(d). Accordingly, on remand, the district court should also exclude these amounts from the total fees and costs awarded.
 
 3.
 
 71
 Finally, the SSA challenges the district court's award of compensation for non-legal tasks performed by a paralegal employed by plaintiffs' counsel, such as opening and sorting mail, making bulk mailings, traveling to post offices and other mail facilities, confirming hotel reservations, speaking with hotel staff, arranging for repairs of a computer, and planning a volunteer recognition breakfast for Hyatt volunteers. As justification, the district court found that the paralegal had supervised 87 persons performing paralegal work to implement and monitor Hyatt III relief and that this task had resulted in the paralegal performing certain administrative tasks that were "essential and necessary." J.A. 1096.
 
 
 72
 Although fees for paralegal time may be recoverable under the EAJA, such fees are only recoverable to the extent they reflect tasks traditionally performed by an attorney and for which the attorney would customarily charge the client. See Jean, 863 F.2d at 778 ("[P]aralegal time is recoverable as part of a prevailing party's award for attorney's fees and expenses, [but] only to the extent that the paralegal performs work traditionally done by an attorney.") (internal quotation marks omitted) (alterations in original); Allen v. United States Steel Corp., 665 F.2d 689, 697 (5th Cir.1982) ("Paralegal expenses are separately recoverable only as part of a prevailing party's award for attorney's fees and expenses, and even then only to the extent that the paralegal performs work traditionally performed by an attorney. Otherwise, paralegal expenses are separately unrecoverable overhead expenses.").
 
 
 73
 Although we do not venture to decide at this time which specific paralegal tasks are not compensable under these principles in this case, we note that the examples given by the SSA do not seem to be of the type that would be traditionally performed by an attorney and charged to the client. On remand, the district court should carefully evaluate the challenged time entries and award only those entries that reflect tasks traditionally performed by an attorney, and that are fairly charged to the activities leading to the discovery of the SSA's failure to comply with the terms of the Settlement Agreement and the litigation of that dispute.
 
 C. Challenges to the Costs
 
 74
 Finally, the SSA challenges the district court's award of $81,224.54 in costs for various items that it contends were either non-compensable or inadequately documented. In particular, the SSA asserts that the district court abused its discretion in awarding costs associated with travel for attorney training sessions in Asheville, Wilmington, and Charlotte; travel for other meetings; booking hotel rooms and meals; and $17,080 in computer consultant charges requested by NCJCDC.
 
 
 75
 As we have previously held, plaintiffs are not entitled to recover attorneys' fees or costs associated with the transfer of file management responsibilities from Legal Services to the NCJCDC or with the training of North Carolina attorneys to handle individual Hyatt III claims. The work was not necessitated by a post-Settlement Agreement position taken by the SSA that was not "substantially justified." Again, we leave for the district court the task of individually evaluating the challenged entries to ensure that the SSA is only charged with those fees and expenses fairly attributable to the monitoring and investigatory activities that led to the discovery of the dispute and to the litigation of that dispute.
 
 V. CONCLUSION
 
 76
 In conclusion, we hold that the district court did not abuse its discretion in finding that the SSA's position in the underlying Settlement Agreement litigation was not "substantially justified" and, therefore, in awarding attorneys' fees and costs under 28 U.S.C.A. § 2412(d). We hold, however, that the district court did abuse its discretion, in the narrow categories discussed, in calculating the amount of fees and costs awarded. Accordingly, we vacate the award of fees and costs and remand for a recalculation of the appropriate amount of fees and costs in accordance with this opinion.
 
 
 77
 
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.
 
 
 
 
 Notes:
 
 
 [1]
 See e.g., Walker v. Bowen, 889 F.2d 47, 49 (4th Cir.1989) ("[P]ain itself can be disabling, and it is incumbent upon the ALJ to evaluate the effect of pain on a claimant's ability to function. Further, while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity." (internal citation omitted)).
 
 
 [2]
 The district court originally intended to deduct fees related to the plaintiffs' work in preparing that portion of the Sixth motion for attorneys' fees which reflected work performed from March 31, 1990 to June 19, 1994, which we had concluded was noncompensable inHyatt V. After the parties were unable to agree upon the amount that should be excluded, however, the district court concluded that this method of calculation was unworkable. As an alternative, the district court reduced the "fees for fees" request related to the Sixth Motion by the same percentage that our Hyatt V decision had reduced the fees generated in the merits portion of the Sixth Fee motion.
 
 
 [3]
 The 1996 Amendments to § 2412(d)(2)(A) increased the statutory per-hour cap from $75 per hour to $125 per hourCompare 28 U.S.C.A. § 2412(d)(2)(A)(ii) (West 1994) with 28 U.S.C.A. § 2412(d)(2)(A)(ii) (West Supp. 2002). The district court's award for attorneys' fees incurred prior to the amendment properly reflected the lower per-hour cap.
 
 
 [4]
 The district court also increased counsels' hourly rate by a "cost of living" increase, which the SSA does not dispute
 
 
 [5]
 We note that "special factors" have been applied in the past to increase the hourly rates of plaintiffs' counselSee Hyatt II, 807 F.2d at 382-83. Hyatt II, however, was decided before Pierce and, therefore, plaintiffs do not rely upon it as support in this case.